+UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOY L. MATTISON,

                              Plaintiff,

        v.

JOHN E. POTTER, Postmaster General,
 UNITED STATES POSTAL SERVICE,


                        Defendants.

_____

|                    |                                      |
|--------------------|--------------------------------------|
|                    | **REPORT**                           |
|                    | **and**                              |
|                    | **RECOMMENDATION**                   |
|                    |                                      |
|                    | 03-CV- 0443A(F)                      |

APPEARANCES:         WATSON, BENNETT, COLLIGAN,
                            JOHNSON & SCHECTER
                     Attorneys for Plaintiff
                     THERESA E. QUINN, of Counsel
                     12 Fountain Plaza
                     600 Fleet Bank Building
                     Buffalo, New York 14202-2287

                     TERRANCE P. FLYNN
                     UNITED STATES ATTORNEY
                     Attorney for Defendant
                     LYNN S. EDELMAN
                     Assistant United States Attorney, of Counsel
                     Federal Centre
                     138 Delaware Avenue
                     Buffalo, New York 14202

## <u>JURISDICTION</u>

     This case was referred to the undersigned by Honorable Richard J. Arcara on

September 18, 2003 for report and recommendation on dispositive motions.  The

matter is presently before the court on Defendant's motion for summary judgment (Doc.

No. 38), filed October 7, 2005.

## BACKGROUND

Plaintiff Joy L. Mattison ("Plaintiff" or "Mattison"), an African-American female, commenced this action *pro se* on June 10, 2003, alleging that she had been subjected to employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112-12117 ("the ADA").  Defendant John E. Potter, Postmaster General of the United States Postal Service ("Defendant") filed an answer on September 15, 2003.

On March 10, 2004, Plaintiff, represented by counsel, filed an Amended Complaint (Doc. No. 22) ("Amended Complaint").  On November 1, 2004, the parties stipulated to the filing of a Second Amended Complaint (Doc. No. 26) ("Second Amended Complaint"), alleging that while employed by the United States Postal Service ("USPS" or "the Postal Service"), she was discriminated against with regard to the terms and conditions of employment, subjected to hostile work environment and retaliated against in violation of Title VII and § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 ("the Rehab Act" or "§ 501").[1]  Defendant's answer to the Second Amended Complaint (Doc. No. 27), was filed November 4, 2004.

On October 7, 2005, Defendant filed the instant motion for summary judgment (Doc. No. 38) ("Defendant's motion").  The motion is supported by a Memorandum of Law (Doc. No. 43) ("Defendant's Memorandum"), a Statement of Facts (Doc. No. 44) ("Defendant's Statement of Facts"), the Declarations of Rhonda Spates-Benton (Doc.

---

[1] Plaintiff's ADA claim, alleged in the Complaint, is not alleged in the Second Amended Complaint.

No. 39) ("Spates-Benton Declaration"), with attached exhibits ("Spates-Benton Exh(s) __"), Kathleen M. Matter (Doc. No. 40) ("Matter Declaration"), and Angela Cannon (Doc. No. 41) ("Cannon Declaration"), and a volume of exhibits (Doc. No. 42) ("Defendant's Exh(s). __").  In opposition to summary judgment, Plaintiff filed on November 10, 2005, a Statement of Material Facts (Doc. No. 46), the Affidavits of Joy L. Mattison (Doc. No. 47) ("Plaintiff's Affidavit"), with attached exhibits ("Plaintiff's Exh(s) __"), Roland Johnson (Doc. No. 48) ("Johnson Affidavit"), with attached exhibits ("Johnson Affidavit Exh(s) __"), and Dr. Sharon Ziegler (Doc. No. 49) ("Dr. Ziegler Affidavit"), with attached exhibits ("Dr. Ziegler Affidavit Exh(s). __"), and a Memorandum of Law (Doc. No. 50) ("Plaintiff's Memorandum").  In further support of summary judgment, Defendant filed on November 23, 2005, a Reply Memorandum of Law (Doc. No. 52) ("Defendant's Reply"), and the Supplemental Declaration of Rhonda Spates-Benton (Doc. No. 53) ("Spates-Benton Supplemental Declaration"), with attached exhibits ("Spates-Benton Supplemental Exh(s). __").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for summary judgment should be GRANTED.

## FACTS[2]

Plaintiff, an African-American female, commenced employment with the Postal Service on December 11, 1993, working as a mail handler at the USPS Processing and Distribution Center ("PDC"), at 1200 William Street in Buffalo, New York.  In March

---

[2] Taken from the pleadings and motion papers filed in this action.

3

1995, Plaintiff bid for and was awarded a position ("bid position") in the PDC's Sack-Sort Unit as a sack-sort keyer, a grade level 5 employee on Tour III (third shift) with regular hours of duty from 3:30 P.M. to 12:00 A.M.   In the Sack-Sort Unit, which was located in an elevated area above the PDC's main floor but which no longer exists, sacks of mail placed on conveyer belts were routed to the sack-sort area, arriving at the top of a long sack-sort slide ("the slide").  The sack-sort keyers were located at five keying stations at the base of the slide.  A panel operator located in front of several monitors could view the mail sacks arriving from various parts of the PDC and would regulate the routing of the mail sacks to the sack-sort keyers by operating a deflector at the top of the slide, thereby releasing mail sacks at various points along the slide to the keyers below.  Upon being released by the deflector, a mail sack would travel down the slide to the designated sack-sort keyer who would pull the mail sack off the slide, key the mail sack to its destination, and then place the mail sack onto another conveyer belt for further processing.

The slide was equipped with skid strips to slow the mail slack as they reached the bottom of the slide. Panels were located at the base of the slide in front of each keying station to protect the keyers from the sliding bags.  When panels were down to permit removal of a mail sack, keyers relied on mail sacks at the bottom of the slide to cushion against other mail sacks as they slid down to their keying stations.

Humps on the slide divided mail sacks as they slid down to the different keying stations.  Mail sacks would sometimes get stuck on the humps, resulting in the diversion of the mail slacks to keying stations other than originally intended.  At other times, the mail sacks would break open, allowing the loose letters to fall down the side

4

of the slide requiring their retrieval by the sack-sort keyers.  The slide was marked with a safety line serving as a guide by which the panel operator determined when to stop the mail sack flow to any given keying station.  The slide would occasionally experience such mechanical problems as malfunctioning of the deflector, causing mail sacks to be repeatedly released into the same sack-sort station, or sacks to back up along the top of the slide.

In November 1996, Mattison discussed with Kathy Matter ("Matter"), a co-worker in the Sack-Sort Unit, that neither Mattison nor Matter had been offered overtime work. Mattison and Matter advised union steward Joseph Funk ("Funk") about the overtime situation, and Funk responded that Ed Wozniak ("Wozniak"), the sack-sort panel operator on Mattison's shift, was responsible for informing sack-sort keyers of overtime work opportunities.  Mattison later learned that Wozniak had not informed Mattison and Matter about overtime work opportunities because Wozniak preferred to work the overtime hours himself.  Wozniak subsequently was removed from the task of informing other USPS employees about overtime work opportunities.[3]  Shortly thereafter, Mattison reported a series of abusive incidents in which she alleges she was targeted by Wozniak and other co-workers in the Sack-Sort Unit.

In particular, Mattison maintains that Wozniak began operating the slide control panel so as to cause heavy mail sacks to fall on Mattison, and that other co-workers in the Sack-Sort Unit, including Pascal Ballisteri ("Ballisteri"), John O'Connor ("O'Connor"),

---

[3] The record does not identify the supervisor who removed the overtime work opportunity assignment task from Wozniak.  Nor does the record indicate if any Wozniak informed any other Sack-Sort Unit employees of overtime work opportunities.

and Larry Kearney ("Kearney"), joined with Wozniak in harassing Mattison.[4]  Mattison

reported the harassment to her supervisor, Mark Stokes ("Stokes"), union steward Peter

Hirchbine ("Hirchbine"), and Labor Relations Director of the National Alliance of Postal

and Federal Employees Roland Johnson ("Johnson"), but that no action was taken

against Wozniak, Ballisteri, O'Connor or Kearney.

On January 21, 1997, Mattison was again hit by mail sacks allegedly improperly

directed down the slide by Wozniak.  Mattison reported the incident to Stokes and

Johnson, causing Stokes to sent a letter to the local United States Postal Inspector's

Office about the incident, but, again, no action was taken against Wozniak.

On February 6, 1997, Mattison tripped over a 20 foot long transparent plastic

green band near Mattison's keying station in the Sack-Sort Unit, and nearly fell down

some stairs.  Mattison maintains that Kearney intentionally placed the transparent

plastic band at the top of the stairs to cause Mattison to fall down the stairs.  Mattison

reported the incident to a supervisor, John Burnham ("Burnham"), and to Johnson, and

filed an incident report with the Postal Police, but no disciplinary action was ever taken

against Kearney.  Mattison maintains that at the time of this incident, the area was

otherwise clean with no garbage or strapping bands on the floor.

On February 19, 1997, Ballisteri allegedly continuously and abruptly directed mail

sacks to Mattison by loading mail sacks over the safety line to harass Mattison, and

Wozniak intentionally operated the sack-sort slide control panel in such a manner as to

---

[4] Mattison does not specify the exact date the alleged abuse first occurred, but a clear reading of
the record indicates it began between November 1996, when the Sack-Sort Unit overtime work
assignment task was removed from Wozniak, and January 21, 1997, when Mattison maintains she was
again hit with sliding mail sacks.

cause mail sacks to strike Mattison.  On February 24, 1997, Mattison reported to supervisor Rob Gorney ("Gorney"), and Funk and Johnson, and also filed a Postal Police Report alleging that Ballisteri had caused sacks of mail to strike Mattison, but no action was taken against Ballisteri.  When Mattison complained to Funk about Wozniak's actions, Funk responded that Wozniak was an "asshole," and that Funk would speak with Wozniak.  However, upon returning to the Sack-Sort Unit, Mattison was again hit by mail sacks while Wozniak operated the slide control panel.  Mattison maintains that throughout this period, Mattison was the only female employee stationed in the Sack-Sort Unit during Tour 3, *i.e.*, the third shift at the PDC.

On April 13, 1997, Mattison reported to Stokes that Ballisteri intentionally jabbed his elbow into Mattison's right side while walking past her, however, Ballisteri was not disciplined in connection with the incident.  On April 15, 1997, Kearney allegedly threw a flat envelope at Mattison, nearly striking Mattison in the face.

On September 1, 1997, as Mattison worked overtime on Tour 2 in the truck terminal and was about to report to the Sack-Sort Unit for her Tour 3 shift, Mattison experienced severe chest pains and was transported by the PDC to a local hospital where the treating physician diagnosed an anxiety attack.  Mattison did not return to work that week, citing fear of her Sack-Sort Unit co-workers' and management's failure to take any action against the alleged harassment perpetrators.

On Septmeber 17, 1997, Mattison complained to union steward Hirchbine and Supervisors Tom Gasewicz ("Gasewicz"), and Burnham that upon returning to her assigned position in the Sack-Sort Unit on September 7, 1997, O'Connor, Kearney and Wozniak continued to harass her.  Gasewicz and Burnham informed Mattison nothing

7

could be done about the harassment absent some proof such as an admission of guilt by the alleged harassers.

On September 21, 1997, Mattison complained to the Postal Service Police that Wozniak again intentionally caused mail sacks to strike her.  In connection with the complaint, Burnham took statements from Wozniak and O'Connor, who had witnessed the incident.  O'Connor, however, explained that a malfunctioning A-19 deflector had caused the mail sacks to strike Mattison.  Wozniak was never subjected to any disciplinary action in connection with the incident.

Citing emotional and physical stress caused by the alleged harassment endured in the Sack-Sort Unit, Mattison applied for and was granted a medical leave from her job, commencing October 6, 1997 and continuing through January 5, 1998.  On October 10, 1997, while on medical leave, Mattison filed a claim with the United States Department of Labor ("DOL") Officer of Worker's Compensation Program ("OWCP"), seeking compensation benefits for "occupational stress" ("the OWCP claim").  On November 25, 1997, Mattison filed her first of seven complaints with the Equal Employment Opportunity Commission ("EEOC"), Complaint, No. 1B-141-0005-98 ("First EEOC Complaint"), alleging she was subjected to a hostile work environment and discrimination based on race and sex arising from the alleged harassment Mattison endured while working in the Sack-Sort Unit after complaining about Wozniak's abuse of his overtime assignment responsibilities.

Upon returning to work on January 6, 1998, Mattison provided medical documentation, including a report prepared by Mattison's primary care physician, Sharon Ziegler, M.D. ("Dr. Ziegler"), in support of Mattison's request for a reasonable

accommodation such that Mattison would not be subjected to the emotional and physical stress she experienced working in the Sack-Sort Unit.  Mattison's request was initially granted with Mattison temporarily assigned to the 010 Unit, where Mattison was responsible for mail preparation, including hand stamping and facing mail.

The 010 Unit, although remotely located with regard to the Sack-Sort Unit, was in a high traffic area of the PDC and surrounded by four aisles through which many USPS employees passed on a regular basis.  On February 24, 1998, Mattison complained to Rhonda Spates ("Spates"), a Tour 3 Manager of Distribution Operations ("MDO"), that while working in the 010 Unit, Mattison's former Sack-Sort Unit supervisors, including Burnham, Patterson, Stokes, and other Sack-Sort Unit supervisors with whom Mattison had limited contact,[5] Rick Thomas ("Thomas") and Mike Petit ("Petit"), would place themselves within Mattison's line of vision and stare at her.  No action was taken against the supervisors in connection with these complaints.  Mattison also complained that supervisors would hide behind columns to watch her, would pass through areas near the 010 Unit so as to stare at Mattison.

Upon being assigned to the 010 Unit, Mattison signed the 010 Unit's overtime list and had worked two days of overtime there when the Mail Handlers Union filed a grievance against Mattison.  In particular, Spates informed Mattison that, pursuant to a Memorandum of Understanding between the USPS and the Mail Handlers Union ("the Union"), because Mattison was only temporarily assigned to the 010 Unit, she was ineligible for overtime in the 010 Unit unless Mattison also signed the overtime list for

---

[5] Mattison had previously reported harassment by co-workers Ballisteri, O'Connor, Kearney,and Wozniak to Sotkes and Burnham.  Facts, *supra*, at 5, 6, 7.

the Sack-Sort Unit where her bid position was located.  Mattison maintains that she was denied overtime in the 010 Unit to retaliate against her for complaining about workplace harassment.

Mattison alleges that although she remained assigned to the 010 Unit, she continued to be subjected to non-verbal harassment by several supervisors, including Burnham, Patterson, Stokes, Petit, Thomas and Dave Mello, from February 1998 though April 1998.  In particular, Mattison maintains the supervisors stared at her, hid behind columns so as to watch Mattison, would pass through the 010 Unit for no other reason than to stare at her, and that Thomas engaged in such "stalking behavior" as sneaking up behind and startling her, staring in an inappropriate and threatening manner, making harassing remarks, staring at Mattison's buttocks when she bent over and making sure Mattison saw Thomas leering at her, and following Mattison into the USPS facility at the start of Mattison's shift.  Second Amended Complaint ¶ 31. Mattison complained that on April 2, 1998, Acting Supervisor Mello walked past Mattison who was on break and made kicking motions in Mattison's direction.  Despite Mattison's complaints to various supervisors, Johnson and the Buffalo Police,[6] no disciplinary action was ever taken against the alleged harassers.

On April 6, 1998, Mattison's OWCP claim for compensation benefits related to occupational stress was denied.  The Notice of Decision states that Mattison's allegations in support of the OWCP claim were unsupported and that an investigation into the allegations regarding mail sacks being sent down the slide in such a manner

---

[6] The record does not indicate whether, despite contacting the Buffalo Police, Mattison filed a criminal complaint.

that Mattison was repeatedly struck by the sacks showed only a malfunctioning slide deflector for which a work order had been filed.  On April 7, 1998, Mattison filed her second EEOC complaint, No. 1B-141-0021-98 ("Second EEOC Complaint"), alleging discriminatory harassment based on sex, race and disability, as well as retaliation for prior EEOC activity.

By letter dated April 10, 1998 ("April 10, 1998 Letter"), USPS Senior Injury Compensation Specialist Cathleen Taylor ("Taylor") informed Mattison that the denial of the OWCP claim required Mattison to immediately resume her bid position in the Sack-Sort Unit, and that if Mattison was unable to do so, advised Mattison to request a restricted light duty assignment.  On April 12, 1998, Supervisors Burnham, Stokes and Gasewicz informed Mattison that she would have to report back to the Sack-Sort Unit.  On April 13, 1998, Mattison met with MDO Spates, Union Administrative Vice President Gail Graham ("Graham"), and Union Steward Daryl Lark ("Lark"), and Spates gave Mattison until April 20, 1998, to provide medical documentation in support of Mattison's request not to work in the Sack-Sort Unit.

On April 20, 1998, Mattison provided Spates and other, unidentified supervisory personnel with a letter from her primary physician, Dr. Ziegler, dated April 17, 1998 ("Dr. Ziegler April 17, 1998 Letter"), stating "I recommend that Joy Mattison not be placed back in sack-sort area because working in that area is too stressful due to hostile work environment and past history.  Please allow her to work in the 010 area."  Dr. Ziegler April 17, 1998 Letter (Ziegler Affidavit Exh. B).  Dr. Ziegler also indicated that Plaintiff's diagnosis was "anxiety/depression due to stressful work situation," with a work restriction that Mattison "[m]ay not return to sack-sort area.  May work in area 010."  *Id*.

MDO Spates found Dr. Ziegler's April 17, 1998 Letter to be unsupported by any objective medical evidence, but allowed Mattison to continue working in the 010 Unit and requested Mattison undergo a fitness for duty examination to substantiate Mattison's claim that she was unable to work in the Sack-Sort Unit.  On April 21, 1998, Mattison submitted to Supervisor Burnham a request for leave under the Family and Medical Leave Act ("FMLA").

On April 26, 1998, Supervisor Patterson advised Mattison that her status while working outside her bid unit was "unassigned regular," such that Mattison held no seniority rights and was considered subordinate to "casual" or non-career Postal Service employees who only worked during exceptionally busy times such as holidays. Later that same day, Mattison left work early because of job-related stress Mattison attributed to harassment by Thomas.  Specifically, Mattison maintains that Thomas followed Mattison around the postal facility, stared at her and made harassing comments under his breath.  Mattison, who did not report to work for two more days and, alleges that upon returning to work on April 29, 1998, Thomas resumed stalking her by standing in the entranceway to the PDC through which Mattison was required to pass to punch in at the time clock upon her arrival.

On May 1, 1998, Mattison filed another EEOC Complaint, No. 1B-141-0024-98, which was consolidated into the Second EEOC Complaint filed on April 7, 1998. Specifically alleged in the Second EEOC Complaint is that while assigned to the 010 Unit, Mattison was denied overtime work opportunities, was harassed by her supervisors, and MDO Spates and a USPS nurse had an improrer private and unauthorized conversation about Mattison's alleged disability.

12

On May 13, 1998, at the Postal Service's direction, a fitness for duty examination was performed on Mattison by John B. Grippi, M.D. ("Dr. Grippi"). On June 1, 1998, Mattison filed a third EEOC Complaint, No. 1B-141-0028-98 ("Third EEOC Complaint"), alleging discrimination based on race, sex, mental disability and retaliation for Mattison's prior EEOC activities.

On July 7, 1998, Dr. Grippi reported his finding from the fitness for duty examination. Specifically, Dr. Grippi reported that Mattison had a "medical problem which is under appropriate monitoring and treatment at this time," and assessed "no medical risk/restriction" prevented Mattison from performing the essential functions of her bid position in the Sack-Sort Unit without any accommodation. Dr. Grippi Report, Defendant's Exh. Q.

On July 31, 1998, Mattison filed a grievance against Thomas with regard to the alleged April 29, 1998 stalking incident. No disciplinary action was taken against Thomas.

On September 2, 1998, MDO Spates informed Mattison that she had been found physically fit for duty and ordered Mattison to immediately return to work in her Sack-Sort Unit position. When Mattison refused to report to the Sack-Sort Unit, Spates ordered Mattison to leave the building.

Mattison learned on September 8, 1998, that she had been suspended without pay, and, at the suggestion of USPS EEOC Counselor Carianne Reggio ("Reggio"), submitted a request for a reasonable accommodation of her alleged disability. In particular, the accommodation requested was a "light duty assignment on Tour 3," and that Mattison "be kept out of the sack sort area." Defendant's Exh. S. On September 9,

1998, Reggia informed Mattison that the request had been approved and that Mattison could return to work that afternoon.  Nevertheless, upon reporting for work, Spates refused to assign Mattison to a light duty position and ordered Mattison to work in the Sack-Sort Unit without restriction.

On December 11, 1998, Mattison filed a fourth EEOC Complaint, No. 1B-141-0041-98 ("Fourth EEOC Complaint"), alleging discrimination based on race, sex, mental disability and retaliation for prior EEOC activity.  The Fourth EEOC Complaint was premised on the fact that Mattison had been directed to return to her bid position in the Sack-Sort Unit after being found fit for the job, and the denial of Mattison's request for a light duty position.  In September 1998, Mattison commenced a six-month leave of absence.

On October 29, 1998, Mattison was examined by an independent psychiatrist, Ellen D. Dickenson, M.D. ("Dr. Dickinson"), who, on November 2, 1998, diagnosed Mattison as suffering from a major depressive disorder, single episode.  Dr. Dickinson Report, Defendant's Exh. T.  According to Dr. Dickinson, with appropriate and successful treatment, the prognosis for Mattison's major depressive disorder "is very good," and Dr. Dickinson anticipated that Mattison "would be able to work cooperatively and perform all duties of her position if treated."  *Id*.  Dr. Dickinson further noted that situations which Mattison "perceives as traumatic often tend to reprecipitate depressive episodes when the person is re-exposed to the emotionally laden setting."  *Id*.  Dr. Dickinson thus "strongly recommend[ed] that [Mattison] not be returned to the precipitating setting [the Sack-Sort Unit] in the work environment."  *Id*.  (bracketed material added).  Dr. Dickinson also determined that Mattison's work restriction was

permanent. *Id.*

Mattison remained on leave for six months until March 1999 when she was offered a temporary position in the Re-wrap Unit on Tour II with weekends off as a reasonable accommodation of Mattison's depressive disorder.  While assigned to the Re-wrap Unit, Mattison remained at the same pay grade level as at her Sack-Sort Unit bid position, which was higher than the pay grade level of Re-wrap Unit bid positions. On April 23, 1999, the Union filed a grievance regarding Mattison's assignment to the Re-wrap Unit as in violation of the CBA because Mattison's pay grade level was higher than that for Re-wrap Unit bid positions, and asserting that the process by which Mattison was assigned to the Re-wrap Unit subverted the bidding process, and placed Mattison in a position which had been reverted or abolished, displacing a 33-year USPS employee, violating the integrity of both the CBA and the bidding/seniority system. Upon reviewing the grievance, the USPA determined Mattison's assignment to an abolished Re-wrap Unit position had violated the CBA.  On September 13, 1999, when Plaintiff was reassigned to the Detached Mail Unit ("DMU") on Tour II with weekends off, and her bid position in the Sack-Sort Unit, which Mattison still held, was put up for bid; Mattison continued to be compensated at the same pay grade level as at her Sack-Sort Unit position.  Mattison was also informed that the DMU assignment was limited to three months during which Mattison was to secure a bid position in another unit at the PDC or be assigned to a residual vacancy.  On September 28, 1999, USPS management and the Union were able to settle the grievance, thereby allowing Mattison to remain in the Re-wrap Unit position for the three month period in which she was to secure another bid position.  Defendant's Exh. W.

On December 1, 1999, Mattison filed a fifth EEOC Complaint, No. 1B-141-0001-00 ("Fifth EEOC Complaint"), alleging discrimination based on race and disability and retaliation for her prior EEOC activity.  The essence of the Fifth EEOC Complaint was that upon posting Mattison's permanent bid position in the Sack-Sort Unit for bid, Mattison was to be reassigned to the DMU.

Mattison remained in the Re-wrap Unit for more than three months until February 2000.  During that time, Mattison failed to bid for any permanent assignments.  As such, in March 2000, Mattison was given a choice of two positions outside the Sack-Sort Unit. Mattison failed to indicated which of the two positions she wished to take and, thus, was assigned by the Postal Service to a Tour III position in the Small Parcel Bundles Sorting Unit ("SPBS Unit"), located adjacent to the Re-Wrap Unit.  For the two-week period in which Mattison was assigned to the SPBS Unit, Mattison was absent pursuant to her FMLA leave, during which time Mattison successfully bid on a Tour II position in the Magazine Unit where Mattison commenced working in March 2000.  The Magazine Unit was physically located within the PDC closer to the Sack-Sort Unit than was the SPBS Unit.

On July 31, 2000, Mattison reported that while working at her bid position in the Magazine Unit, she observed Wozniak working directly across the aisle from her in the Sack-Sort Unit, and, fearing Wozniak would harm her despite the fact that Wozniak did not act in a threatening manner, Mattison suffered a panic attack.  Mattison sought assistance from the Magazine Unit supervisor Yvonne Lewis ("Lewis") but, being unable to locate Lewis, went to Postal Service nurse Virginia Sabatini ("Sabatini").  Sabatini reportedly told Mattison she "didn't want anything to do with this," Second Amended

Complaint ¶ 55, and left Mattison in the nurse's office while Sabatini attempted to contact Lewis.  Because Sabatini was not offering the assistance Mattison desired, Mattison left the nurse's office and went to the office of Acting MDO Audrey Braun ("Braun"), where Mattison was advised by Braun, supervisor Jim Brick ("Brick"), and Lewis that Wozniak could not be prevented from working overtime in the Sack-Sort Unit.  To further accommodate Mattison, the Postal Service offered that whenever Wozniak worked overtime on Tour II in the Sack-Sort Unit, Mattison could either work in the Expansion Unit of the PDC, or in the slides area of the Magazine Unit which was more secluded.  Mattison was also advised that she could place web cages in the Magazine Unit in such a manner as to create a three-sided barrier which would block Mattison's view of Wozniak.  Mattison never availed herself of any of the proposed further accommodations.

On February 4, 2001, Lewis advised Mattison and other USPS employees about a new policy, effective as of March 2001, requiring employees taking a FMLA absence to call in daily and submit documentation from a physician before returning to work. Mattison maintains that on February 10, 2001, she was informed by Lewis that the new policy was effective immediately as to Mattison, and that Mattison would have to provide written medical documentation whenever Mattison returned from an FMLA absence, including an absence to attend a doctor's appointment for treatment of an FMLA covered condition.  Such Return to Work Certification was to be submitted to the Postal Medical Officer at least one workday prior to the anticipated return to work date. Mattison maintains that she was informed by co-workers that they were not required to comply with the new policy.

17

At the time the new FMLA policy was implemented, Mattison had been scheduling two to three appointments a week, with her physician, during her scheduled work hours. Upon reviewing submitted FMLA requests for compliance with DOL requirements and notifying the employee, supervisor and the Time and Attendance ("RMD")[7] office whether the employee had approved FMLA coverage, former FMLA Coordinator Laura Lewis ("Laura Lewis") observed that although Mattison's depressive disorder required two doctor's appointments for treatment each month, Mattison had been scheduling her doctor's appointments during her scheduled work hours. Laura Lewis contacted Mattison's health care providers to see if it were possible for Mattison to schedule her doctor's appointments during hours other than those for which Mattison was scheduled to work, and learned it was. On March 24, 2001, Yvonne Lewis, Mattison's Magazine Unit Supervisor, advised Mattison that Mattison should schedule her doctor appointments during personal time, rather than during her regularly scheduled work hours. Mattison maintains that Yvonne Lewis's statements regarding the scheduling of Mattison's doctor's appointments constituted harassment, and that Laura Lewis improperly conversed with Mattison's physician.

On April 2, 2001, Yvonne Lewis told Mattison that because her disability was not job-related, Mattison would have to schedule her doctor's appointments during her personal time. Mattison became physically and emotionally upset over Yvonne Lewis's statements which Mattison considered as harassment, Second Amended Complaint ¶ 66, and contacted a Postal Service nurse to complete a form documenting the job-

---

[7] Why the initials "RMD" are used to refer to the Time and Attendance Office is not explained in the record.

related stress for which Mattison then took a leave from work.

Mattison's latest work absence continued for two weeks, during which Mattison consulted with her medical doctor and psychologist, and determined that Mattison's work circumstances would continue to jeopardize Mattison's health if she remained employed at the Postal Service. Accordingly, Mattison resigned from the Postal Service on April 13, 2001, alleging she had been constructively discharged.

On October 24, 2001, the USPS EEOC issued a Notice of Final Decision ("the Final Decision") dismissing Mattison's First, Second, Third, Fourth and Fifth EEOC Complaints for failure to establish a claim of discrimination or discriminatory harassment under Title VII or the Rehab Act, and for failure to establish a retaliation claim. Mattison appealed the dismissal of her first five EEOC Complaints to the EEOC Office of Federal Operations ("OFO").

Mattison filed, on January 18, 2002, a sixth EEOC Complaint, No. 1B-141-0011-02 ("Sixth EEOC Complaint"), alleging employment discrimination based on race and disability, as well as retaliation for Mattison's prior EEOC activity which Mattison alleged forced her to resign from the Postal Service. In a decision dated March 10, 2003, the OFO affirmed the EEOC's Final Decision, finding that "the preponderance of the evidence of record does not establish that discrimination occurred." OFO Decision, Defenant's Exh. DD. By order dated September 16, 2003, Mattison's Sixth EEOC Complaint was dismissed on the basis that Mattison had already commenced the instant action which terminated the EEOC process.

19

## DISCUSSION

**1.     Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Tenenbaum v. Williams*, 193 F.3d 58, 59 (2d Cir. 1999) (citing *Anderson*, 477 U.S. at 255).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, *supra*, at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  In assessing a record to determine whether there is genuine issue of material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.  *Rattner*, 930 F.2d at 209.

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported

as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving

party to go beyond the pleadings and by her own affidavits, or by the 'depositions,

answers to interrogatories, and admissions on file,' designate 'specific facts showing

that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 323-24 (1986) (quoting Fed.

R. Civ. P. 56).  Thus, "as to issues on which the non-moving party bears the burden of

proof, the moving party may simply point out the absence of evidence to support the

non-moving party's case."  *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164

F.3d 736, 742 (2d Cir. 1998).  Once a party moving for summary judgment has made a

properly supported showing as to the absence of any genuine issue as to all material

facts, the nonmoving party must, to defeat summary judgment, come forward with

evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v.

March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

Although a summary judgment motion may be made with or without supporting

affidavits, if affidavits are submitted, they "shall be made on personal knowledge, shall

set forth such facts as would be admissible in evidence, and shall show affirmatively

that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P.

56(a).  Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in
> this rule, an adverse party may not rest upon the mere allegations or denials of
> the adverse party's pleading, but the adverse party's response, by affidavits or
> as otherwise provided in this rule, must set forth specific facts showing that there
> is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"However, if the motion for summary judgment is not made and supported as provided

in Rule 56, the Rule does not impose on the party opposing summary judgment an

obligation to come forward with affidavits or other admissible evidence of his own." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) (reversing granting of summary judgment in favor of defendant because defendant failed to allege factual basis for assertions contained in defendant's affidavit such that plaintiff, as the party opposing summary judgment, was not required to adduce evidence to defeat summary judgment and the "self-serving" nature of plaintiff's affidavit statements went to the weight of the statements, rather than to their admissibility).

### 2.    Abandoned Claims

In the Second Amended Complaint, Mattison claims that she was subjected to disparate treatment and a hostile work environment and was retaliated against by the Postal Service, all in violation of Title VII and the Rehab Act.  Second Amended Complaint ¶¶ 75 and 77.  The Postal Service seeks summary judgment on the basis that Mattison is unable to establish a *prima facie* case as to any of her claims.  In opposition to summary judgment, Mattison addresses only her hostile work environment claim under Title VII, and her disparate treatment claim under the Rehab Act.  Mattison does not, however, address her disparate treatment claim under Title VII, her hostile work environment claim under the Rehab Act, or her retaliation claim under Title VII and the Rehab Act.

The claims Mattison fails to address in opposition to summary judgment should be deemed abandoned.  *Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal Courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the

22

argument in any way"); *Dineen v. Stramka*, 228 F.Supp.2d 447, 454 (S.D.N.Y. 2002)

(holding that plaintiff's failure to address claims in papers filed in opposition to summary

judgment "enabl[es] the Court to conclude that [plaintiff] abandoned them"); *Douglas v.*

*Victor Capital Group*, 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998) (holding where

defendant's summary judgment papers specifically address employment discrimination

claims raised in complaint, and plaintiff's opposition papers fail to respond to such

arguments, court may deem all such claims abandoned and grant summary judgment

as to such claims); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F.Supp. 895, 907 n. 11

(S.D.N.Y.) (dismissing with prejudice on summary judgment motion claim for which

plaintiff failed to provide any argument in opposition to defendant's motion), *aff'd*, 130

F.3d 1101 (2d Cir. 1997).

As such, Mattison's claims for disparate treatment claim under Title VII, for

hostile work environment claim under the Rehab Act, and for retaliation under both Title

VII and the Rehab Act should be deemed abandoned and summary judgment as to

such claims should be GRANTED in favor of Defendant.

**3.     Burden Shifting Analysis**

Claims of employment discrimination under Title VII are subject to a burden-

shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993).  The same burden-

shifting analysis applies to employment discrimination claims under the Rehab Act,

*Regional Economic Community Action Program v. City of Middletown*, 294 F.3d 35, 8-

49 (2d Cir. 2002), as well as to retaliation claims under both Title VII and the Rehab

Act.  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (Title VII

retaliation claim); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (Rehab

Act retaliation claim).

The plaintiff bears the initial burden of establishing a *prima facie* case of unlawful

discrimination, *Treglia*, 313 F.3d at 719, and the plaintiff's initial burden to defeat

summary judgment is "*de minimus.*"  *McLee v. Chrysler Corp.*, 109 F.3d 134, 134 (2d

Cir. 1997) (citing cases). Upon such a showing, the burden of going forward shifts to the

employer, who must articulate some legitimate, non-discriminatory reason for the

employee's termination or adverse employment action.  *Texas Dept. of Community*

*Affairs v. Burdine,* 450 U.S. 248, 254 (1981); *Hicks*, 509 U.S. at 507.  The ultimate

burden of production then shifts back to the plaintiff to demonstrate "'that the proffered

reason was not the true reason for the employment decision.'" *Hicks*, 509 U.S. at 508

(quoting *Burdine*, 450 U.S. at 256).  "An employer's reason for the termination [or

adverse employment action] cannot be proven to be a pretext for discrimination unless

it is shown to be false and that discrimination was the real reason."  *Quaratino v. Tiffany*

*& Co.*, 71 F.3d 58, 64 (2d Cir.1995) (bracketed text added).  The burden of persuasion,

however, at all times remains with the plaintiff on the issue of the true motivation for the

discrimination.  *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 253.  Thus, to defeat a

defendant's properly supported motion for summary judgment, the plaintiff must

produce sufficient evidence to support a rational finding that the legitimate, non-

discriminatory reasons proffered by the employer were false, and that more likely than

not the employee's race was the real reason for the discharge or adverse employment

action.  *Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 129 (2d Cir. 1996), *cert. denied*, 520

24

U.S. 1228 (1997).

### A.    *Prima Facie* Case of Employment Discrimination

In accordance with the burden-shifting analysis, the court first examines whether Mattison is able to meet the initial burden of establishing a *prima facie* case as to any of her claims.  In particular, to avoid summary judgment, Mattison must first establish a *prima facie* case of employment discrimination under Title VII based on a hostile work environment or under the Rehab Act based on disparate treatment.

### 1.    Title VII

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileged of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1)).  "A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that the harassment on one of more of these bases amounted to a hostile work environment."  *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004).  *See Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (observing that two discrimination theories are available under Title VII, including disparate treatment, also referred to as "*quid pro quo*" discrimination, and hostile work environment).  Here, Mattison asserts she was subjected to a racially and sexually hostile work environment.

With regard to Mattison's hostile work environment claim, the Supreme Court has stated, "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  A hostile work environment claim is established if the plaintiff demonstrates that (1) the alleged harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) a specific basis for imputing the conduct creating the hostile work environment to the employer.  *Feingold*, 366 F.3d at 149-50 (citing *Alfano*, 294 F.3d at 373).  "Proving the existence of a hostile work environment involves showing both 'objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive.'" *Feingold*, at 150 (quoting *Alfano*, at 374 (quoting  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993))).  Factors to be considered include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.'" *Feingold*, at 150 (quoting *Harris*, at 23).  Further, "[a]s a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id*. (quoting *Alfano*, at 374).  However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, at 374.

"The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001), yet

summary judgment may be granted on such a claim where no reasonable factfinder could conclude, considering all the circumstances, that the alleged harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse as a result of one of the form of discrimination prohibited by Title VII. *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 600 (2d Cir. 2006). Further, even if based on the race, color, religion, sex, or national origin of a Plaintiff, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Baton Rouge*, 524 U.S. 775, 788 (1998). Rather, "[t]he incidents of allegedly offensive conduct must also be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Holtz*, 258 F.3d at 75 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

The standard for establishing a hostile work environment is high, yet "the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (italics in original)). Although, to support a hostile work environment claim, the environment need not be unendurable or intolerable, that the law requires the harassment be severe or pervasive to be actionable "does not mean that employer are free from liability in all but the most egregious cases." *Whidbee*, 223 F.3d at 70. Moreover, as relevant to this Title VII case, it is axiomatic that to establish a race or sex based hostile work environment under Title VII, the plaintiff must demonstrate that the conduct occurred because of her race or sex. *Alfano*, at 374

27

(citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (sex-based hostile work environment), and *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999) (race-based hostile work environment)).  Based on the record in the instant case, the incidents on which Mattison relies are insufficient as a matter of law to meet the threshold of severity or pervasiveness required to support a hostile work environment claim.

In support of her hostile work environment claim, Mattison relies on a number of incidents occurring from November 1996 and continuing until Mattison's resignation in April 2001.  Specifically, Mattison maintains that she was subjected to an abusive and hostile work environment beginning in November 1996 when she and another female co-worker, Kathy Matter, asked Union Steward Funk why they were not being offered overtime, leading to the discovery that Wozniak, who at that time was responsible for informing employees of available overtime work opportunities, was keeping the hours for himself, and causing such responsibility to be taken away from Wozniak.  According to Mattison, Wozniak, Ballisteri, O'Connor, and Kearney, on numerous occasions, caused heavy mailbags to fall onto Mattison.  On February 7, 1997, Mattison tripped over a transparent band, which Kearney had placed across a walkway, and almost fell down the stairs Mattison used upon leaving her workstation in the Sack-Sort Unit.  In April 1997, Ballisteri struck Mattison in her side with his elbow while walking past her. Upon returning from a three month medical leave in January 1998, Mattison maintains that her supervisors began to harass her by staring and leering at Mattison in a threatening and intimidating manner.  According to Mattison, one particular supervisor, Thomas, would approach Mattison from behind and startle her, habitually followed

Plaintiff around the postal facility and would "blatantly stare at plaintiff's buttocks whenever she bent over."  Plaintiff's Memorandum at 12.

Mattison maintains that she, an African-American female, was the only person abused and assaulted in the Sack-Sort unit, where all the other employees were white males who acted in concert in directing their harassing conduct toward only Mattison. Plaintiff's Memorandum at 14.  Mattison asserts that none of her male co-workers experienced any similar treatment while working in the Sack-Sort Unit.

Where the work environment is alleged to be racially hostile, "Title VII affords employees the right to work in an environment free from discrimination on the basis of race."  *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999).  There must, however, be some evidence of something more than the fact that the plaintiff is a member of a protected race class; in particular, to prevail on a hostile work environment claim "the plaintiff must establish that his workplace was permeated with instances of racially discriminatory conduct such as 'discriminatory intimidation, ridicule, and insult,' such that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'"  *Williams*, *supra*, at 100 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993) (further internal quotation omitted).

> Whether the environment may be considered sufficiently hostile or abusive to support such a claim is to be measured by the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance.

*Id*. (citing *Harris*, *supra* at 23).

To meet this burden, "the plaintiff must show 'more than a few isolated incidents of racial enmity.'" *Id*. (citing *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986)).

Specifically, "'there must be a steady barrage of opprobrious racial comments.'" *Id.* (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).  Further, "evidence solely of 'sporadic racial slurs' does not suffice."  *Id.  See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (requiring plaintiff demonstrate the she was subjected to harassing conduct that is "so severe or pervasive as to create an objectively hostile or abusive work environment")  (internal citations omitted).  *See also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'") (quoting *Snell, supra*, at 1103).

In the instant case, Mattison has failed to point to any evidence from which a reasonable juror could find that she was subjected to a single incident of racial intimidation, ridicule, insult, slur, comment or joke.  That Mattison deduced the acts of harassment directed at her by her supervisors were racially motivated based on the fact that she was the only black, female employee in the Sack-Sort Unit is simply too speculative to warrant trial.  *See Richardson v. New York State Department of Correctional Service*, 180 F.3d 426, 437 (2d Cir. 1999) (to sustain Title VII hostile work environment claim, plaintiff must produce evidence that she was harassed on the basis of her race or gender).  In  particular, none of the harassing conduct, even if true, attributed to Mattison's co-workers, was racially-tinged, either in the particulars of the conduct, or in context.  Significantly, as discussed, Discussion, *supra*, at 22-23, Mattison has abandoned her retaliation claims.  As such, Mattison's Title VII claim alleging a racially hostile work environment fails.  Similarly, Mattison's Title VII claim alleging sexual harassment based on a hostile work environment also fails.

> To prevail on a claim of sexual harassment based on a hostile work environment, a plaintiff must establish two elements: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."

*Petrosino v. Bell Atlantic*, 385 F.3d 210, 220-21 (2d Cir. 2004) (quoting *Mack v. Otis Elevator Co.*, 326 F.3d 116, 120 (2d Cir.), *cert. denied*, 540 U.S. 1016 (2003)).

Here, the evidence in the record fails to establish that the alleged misconduct was so severe or pervasive as to create an objectively hostile or abusive work environment based on Mattison's gender such that the objective component cannot be met.

In particular, Mattison's allegations of sexual harassment are limited to a very few incidents where she alleges that Thomas leered or stared at her in an inappropriate manner, Second Amended Complaint ¶ 39, and harassed Mattison with "stalking behavior." *Id.* ¶ 41.  Although, even if staring at a female's buttocks by a male co-worker can reasonably be characterized in our society as sexually motivated, this alleged conduct by Thomas was limited to a single incident, Facts, *supra*, at 10, and, as such, is insufficient evidence of a hostile work place based on sex.  *See Richardson*, 180 F.3d at 437 ("Isolated incidents or episodic conduct will not support a hostile work environment," although a single episode of *severe* harassment can establish a hostile work environment, and construing a "severe" incident as one that "alters the conditions of the victim's work environment").  Nor has Mattison further described either the specific behavior she characterizes as "stalking," or the allegedly inappropriate comments.  As such, Mattison has failed to meet her burden of producing evidence from which a rational jury could conclude that the conduct of Thomas, or any other Postal Service employee, "crossed the line between 'boorish and inappropriate'

behavior and actionable sexual harassment." *Holtz*, 258 F.3d at 75.  Moreover, reliance

on the pleadings is insufficient to oppose summary judgment in the absence of some

evidence in the record supporting the subject allegations.  *Celotex*, 477 U.S. at 323-24

(observing that Rule 56(e) "requires the non-moving party to go beyond the pleadings

and by her own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for

trial.'").

Defendant's motion for summary judgment should be GRANTED as to Plaintiff's

claim that she was subjected to a hostile work environment in violation of Title VII.


## 2.      Rehab Act

As stated, Mattison also claims she faced employment discrimination on the

basis of her disability while employed at the Postal Service.  In opposing summary

judgment, Mattison limits her claim to disparate treatment based on the alleged

constructive discharge.  Plaintiff's Memorandum at 8 (stating with regard to the disability

discrimination claim that "[i]n this case the plaintiff's constructive discharge was the

adverse employment action.").  Defendant argues in support of summary judgment that

Mattison cannot establish that she was disabled as defined under the Act.  Defendant's

Memorandum at 18-20.

A federal employee's remedy for disability based discrimination is provided for

under § 501 of the Rehab Act.  In particular,

> Section 501 of the Rehabilitation Act establishes a program within the federal
> government to encourage the employment of individuals with disabilities, and
> applies to '[e]ach department, agency, and instrumentality (including the United

States Postal Service and the Postal Rate Commission) *in the executive branch*.' *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) (emphasis in original). In 1978, Congress amended the Rehab Act to provide for a private right of action to enforce Section 501 by federal employees through the remedies set forth in § 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 ("Title VII").  *Rivera*, *supra*, at 103. In contrast, § 504 of the Rehab Act "is enforced through Title VI of the Civil Rights Act - - a statute which 'is intended to police federally funded programs that do no comply with federal nondiscrimination policies.'"  *Rivera*, 157 F.3d at 104 (quoting *DiPompo v. West Point Military Academy*, 708 F.Supp. 540, 546 (S.D.N.Y. 1989)).

The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination under the Rehab Act.  *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 722 (2d Cir. 1994).  Once a *prima facie* case is established, the burden shifts to the employer to articulate a reason for the adverse employment decision.  *Id.*  Although the Act forbids employment discrimination based on disability, "an employer is entitled to make employment decisions based on the 'actual attributes of the handicap.'"  *Teahan v. Metro-North Community R. Co.*, 951 F.2d 511, 515 (2d Cir. 1991) (citing *Anderson v. University of Wisconsin*, 841 F.2d 737, 740 (7th Cir. 1988), *cert. denied*, 506 U.S. 815 (1992).  If the employer articulates a legitimate, nondiscriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to show such stated reason is mere pretext for discrimination.  *Heilweil*, 32 F.3d at 722.  If, however, the adverse employment decision is predicated on the employee's disability, it is the employer's burden to rebut the inference that the disability was improperly considered by demonstrating that the disability is relevant to qualifications for the position.  *Id.*  An

employer relies on an employee's disability if the employer takes an adverse job action against the employee "solely be reason of" his disability.  *Teahan*, *supra*, at 515.  The ultimate burden remains the plaintiff's to prove he is qualified for the position despite his disability.  *Heilweil*, 32 F.3d at 722; *Teahan*, *supra*, at 514.

To make a *prima facie* case of discrimination under the Rehab Act, a plaintiff must show (1) she qualifies as a handicapped person under the Rehab Act; (2) she is otherwise qualified to perform her job; (3) an adverse employment decision was taken against her based on her disability; and (4) the employer is a recipient of federal financial assistance.  *Heilweil*, 32 F.3d at 722 (citing cases); *Teahan*, *supra*, at 514.

In this case, the parties do not dispute that the second and fourth requirements are satisfied, *i.e.*, that Mattison was otherwise qualified to perform her mail handling job, and that the Postal Service is a recipient of federal financial assistance, Mattison must demonstrate the first and third requirements, including that she is a "handicapped person" so as to qualify for protection under the Rehab Act., and that she was subjected to an adverse employment action, the alleged constructive discharge.  *Doe v. New York University*, 666 F.2d 761, 775 (2d Cir. 1981).  Unless Mattison is such a qualified individual, and proffers evidence establishing she was constructively discharged based on such disability, no liability under the Rehab Act will lie against Defendant.

Whether an individual is a handicapped person under the Rehab Act is determined based on a two-pronged inquiry.  *Heilweil*, 32 F.3d at 722.  The first prong concerns whether a plaintiff has a physical or mental impairment.  Upon establishing he has a physical or mental impairment, the plaintiff must show that the impairment

substantially limits one or more of his major life activities.  *Id.*

The Rehab Act defines the term "individual with handicaps" as

any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

29 U.S.C. § 706(8)(B).

Regulations promulgated by the Department of Health and Human Services, 45 C.F.R.

Part 84 and 28 C.F.R. Part 41, provide guidance in implementing implement the Rehab

Act.  *Heilweil*, 32 F.3d at 722.  The regulations define physical impairment as "any

physiological disorder or condition . . . affecting [the] musculoskeletal [system].  45

C.F.R. § 84.3(j)(2)(i)(A); *see also* 28 U.S.C. § 41.31(b)(1)(I).  "Because the [Rehab] Act

is a remedial statute, it and the regulations promulgated under it are to be broadly

construed."  *Heilweil*, 32 F.3d at 722 (citing *Gilbert v. Frank*, 949 F.2d 637, 641 (2d Cir.

1991).

In the case at bar, the parties do not dispute that Mattison's depressive disorder

satisfies the first prong of the inquiry.  Defendant's Memorandum at 9; Spahr Affidavit, ¶

2.  What is disputed is whether such impairments meet the second prong of the inquiry

to be disabled under the Rehab Act, *i.e.*, whether Mattison's impairment substantially

limits any of Mattison's major life activities.

Defendant maintains that despite Mattison's depressive disorder, Mattison is

unable to substantiate her claim that she is disabled as defined under the Rehab Act as

her impairments do not "substantially limit" any major life activity given that the only

work restriction supported by the evidence in the record is that Mattison should not work

in the Sack-Sort Unit which was deemed to be the source of Mattison's work-related

stress which precipitated her depression.  Defendant's Memorandum at 18-20.  In

opposition to summary judgment, Mattison challenges the Postal Service's

characterization of her work limitations as "shallow and off-base."  Plaintiff's

Memorandum at 6.  According to Mattison, "[h]er limitation concerns the interaction with

her co-workers, who happen to work in that [Sack-Sort] unit."  *Id*.  Mattison further

maintains that because her work impairment is exacerbated by the presence of certain

co-workers whom Mattison maintains harassed her, Mattison's work restriction is more

properly characterized as the need to avoid any hostile work environment within the

Postal Service's PDC.  *Id*.

Rather than specifically defining what is and what is not a "major life activity,"

Rehab Act regulations provide a representative list defining the term as including

"functions such as caring for one's self, performing manual tasks, walking, seeing,

hearing, speaking, breathing, learning and working."  45 U.S.C. § 84.3(j)(2)(ii); *see also*

28 C.F.R. 41.31(b)(2).  Further, the Rehab Act provides no guidance on the

determination of whether a plaintiff's impairment "substantially limits" a major life

activity.  The Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, ("the ADA"),

however, specifically provides that it is to be construed as granting at least as much

protection as provided by the regulations implementing the Rehab Act.  *Bragdon v.*

*Abbott*, 524 U.S. 624, 631-32 (1998).  It follows that unless Mattison's impairment

substantially limits a major life activity under the ADA, Mattison cannot satisfy that test

under the Rehab Act.  Accordingly, the court may rely on the regulations implementing

and caselaw interpretations of the ADA in determining whether Mattison's impairment

substantially limit any major life activity.  *Henrietta D. v. Bloomberg*, 331 F.2d 261, 272

(2d Cir. 2003) (observing that "unless one of those subtle distinctions [between the ADA and the Rehab Act] is pertinent to a particular case, we treat claims under the two statutes identically.").

Whether a particular activity is a major life activity depends on whether the activity is a significant one within the contemplation of the Rehab Act, and not whether the activity is important to a particular plaintiff. *Colwell v. Suffolk County Police Department*, 158 F.3d 635, 642 (2d Cir. 1998) (considering what qualifies as a major life activity in the context of the ADA and citing *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 151-52 (2d Cir. 1998)). Nor is it enough that a particular activity qualifies as a major life activity; instead, to qualify for the Act's protection, the impact of the plaintiff's disability on his ability to perform a particular major life activity must be substantial. *Colwell*, *supra*, at 642.

The term "substantially limits" is defined under the regulations implementing the ADA to mean:

> (i) Unable to perform a major life activity that a person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

In determining whether an individual is substantially limited in a major life activity, the regulations recommend consideration of the following factors: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact of or resulting from the impairment." 29 C.F.R. §

1630(j)(2).

Here, the ability to work is the only major life activity which Mattison asserts is limited by her depressive disorder.  In particular, Mattison maintains she is unable to work in any unit within the Postal Service's PDC which is a hostile work environment. Plaintiff's Memorandum at 6.  This argument, however, fails both because Mattison's alleged limitation does not arise to the requisite level as to "substantially limit" her ability to work, and Mattison has failed to establish any issue of fact which, if decided in her favor, would support a finding of a hostile work environment within the PDC.

When considering the major life activity of working, "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs."  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999). The term "substantially limits" as it applies to the major life activity of working is further specified by the EEOC as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  29 C.F.R. § 1630.2(j)(3)(i).  Factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working include the geographical area to which the individual has reasonable access, as well as the number and types of jobs within the geographical area requiring similar training, knowledge, skills or abilities from which the individual is also disqualified.  29 C.F.R. §§ 1630.2(j)(3)(ii)(A), (B).  In other words,

[t]o be substantially limited in the major life activity of working, then, one must be

38

precluded from more than one type of job, a specialized job, or a particular job of choice.  If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.  Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton*, *supra*, at 491-92.

Moreover, "an otherwise valid job requirement . . . does not become invalid simply because it *would* limit a person's employment opportunities in a substantial way *if* it were adopted by a substantial number of employers."  *Id.* at 493-94 (emphasis in original).

In this case, Mattison has not provided the court with any evidence raising a genuine issue of material fact as to whether her impairment precludes her "from a substantial class of jobs."  Nor has Mattison presented any empirical data regarding the availability in the local economy of jobs which she can perform despite her limitations.  Rather, Mattison's only evidence in opposition to summary judgment is a statement from her treating psychiatrist advising that Mattison could perform her Postal Service job as long as she was not exposed to the Sack-Sort Unit where her depressive condition was exacerbated.  Mattison, as the party on whom the burden to prove disability under the Act lies, *Teahan*, *supra*, at 515, shows only that she is unable to perform a particular type of work at the PDC because of her depression and, as such, Mattison cannot avoid summary judgment on this claim.  The court thus need not address whether Mattison was constructively discharged because of her disability.

Summary judgment on Plaintiff's employment discrimination claim under the Rehab Act should be GRANTED in favor of Defendant.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's motion for summary judgment (Doc. No.

38) should be GRANTED.  The Clerk of the Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     June _7_, 2007
              Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the

Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the

Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in

accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of

Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,*

892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys

for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        June 7, 2007
               Buffalo, New York